## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 5:20cr029 |
| v. | ) | |
| | ) | |
| GHAZWAN AMMAR KHALAF, | ) | By: Michael F. Urbanski |
| | ) | Chief United States |
| Defendant. | ) | District Judge |

### MEMORANDUM OPINION

This motion is before the court on the Defendant's Motion to Suppress Evidence Seized and Statements Elicited in the Course of an Illegal Search and Interrogation. ECF No. 77. The government filed a response in opposition. ECF No. 88. The court heard argument on the motion on September 29, 2022. The issues in the motion center around the length of defendant Ghazwan Ammar Khalaf's ("Khalaf") traffic stop, whether officers had probable cause to search Khalaf's vehicle regardless of a Fourth Amendment waiver, and whether Khalaf's statements should be suppressed according to <u>Miranda</u>. To provide the parties advanced notice of the outcome of the motion to suppress, the court issued an order on October 4, 2022, denying the motion before publishing this opinion. <u>See</u> ECF No. 94. For the reasons stated within, the motion to suppress is **DENIED**.

### I. Facts

Khalaf was driving in Rockingham County around midnight on January 30, 2020, before he was pulled over and a traffic stop occurred with Rockingham County Deputy Sheriff Kyle Shull and his Field Training Officer, Deputy Sheriff Brett Fix. Prior to initiating the traffic stop, the officers were following a black BMW sedan unknowingly driven by Khalaf. The

1

officers witnessed Khalaf's BMW allegedly roll through a stop sign and initiated a traffic stop. After witnessing the traffic infraction and before initiating the traffic stop, the officers followed Khalaf's vehicle for approximately thirty seconds. Just prior to the officers turning on their traffic lights, Khalaf pulled into the driveway of a residence known by police. All events involving the traffic stop took place in this driveway.

After all vehicles were parked, approximately 25 seconds after the stop was initiated, the officers approached Khalaf's vehicle, informed him he had been pulled over because he ran a stop sign, and asked all the individuals in the car for forms of identification. Khalaf provided his driver's license and the passengers provided an identification card and a social security number to the officers.

Officer Shull requested that identification be run on all the individuals according to the information they provided. The officers began processing and communicating Khalaf's and the passengers' information with dispatch approximately two minutes into the stop. The officers learned that Khalaf was a licensed driver but the other individuals had revoked licenses. Additionally, one of Khalaf's passengers, Jesse Pulliam, was on probation for two previous drug offenses and on the "no fourth list." With this information, approximately six minutes into the stop, the officers returned to the vehicle and asked all individuals if they were on probation or the "no fourth list." Khalaf's driver's license was not returned at this time. Next, Deputy Fix asked the passengers to tell him if there was anything illegal in the car and told them that he knew some of them were on probation. Khalaf erroneously assumed he was on the "no fourth list" because he was on probation and asked if the officers were going to search his vehicle anyway. An officer responded by saying yes and seconds later, seven minutes

into the stop, Khalaf admitted to the officers that there was an AR-15 style rifle in the back seat. The gun was removed by Officer Shull from Khalaf's vehicle, seven minutes and forty-five seconds into the stop.

Nine minutes into the stop, Khalaf was removed from the car, placed in handcuffs, detained, and asked if there was anything else in the vehicle. A minute later, Officer Shull informed Khalaf that he was just being detained and not under arrest at that time. Khalaf said he understood that he was being detained, insisted that the gun was not his, and that he was just keeping it for a friend. When Khalaf was frisked shortly after, the officer found methamphetamine, cash, and at least one cell phone on his person.

Twelve minutes after the initial stop, Khalaf was read his <u>Miranda</u> rights by officers, and he replied that he understood his rights. Khalaf began to answer some questions and deputies searched his car. Inside the car, officers found roughly 100 grams of a substance later determined to be actual methamphetamine, two digital scales, and $3680 in cash.

Khalaf was on state probation at the time but was not subject to a warrantless search provision despite telling the officers he thought he was subject to warrantless search. Jesse Pulliam, one of the passengers, was subject to the following special condition from his state court sentence:

> [T]he defendant shall consent to submit his person, place of residence, and property to search or seizure at any time of the day or night by any probation officer or law enforcement officer with or without a search warrant, regardless of whether said officer has reasonable articulable suspicion to stop or probable cause to search. The purpose of this waiver is to ensure that the defendant complies with all of the terms and conditions of his probation.

ECF No. 77-1.

## II. Law and Analysis

### a. Reasonableness and Legality of the Length of the Traffic Stop

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The temporary detention of individuals during a traffic stop constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment, and therefore, the stop of an automobile is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren v. United States, 517 U.S. 806, 809–10 (1996); Delaware v. Prouse, 440 U.S. 648, 653 (1979).

As a general rule, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810. Because an ordinary traffic stop is more like an investigative detention than a custodial arrest, the courts employ the analysis for investigative detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968), to determine the proper scope of a routine stop. United States v. Rusher, 966 F.2d 868, 875 (4th Cir.1992). Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop. United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008).

A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation and normally ends when the police have no further need to control the scene and inform the driver and passengers they are free to leave. See Brendlin v. California, 551 U.S. 249, 258 (2007). During a routine traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Foreman,

4

369 F.3d 776, 781 (4th Cir. 2004). After the commencement of a stop, an officer is entitled to conduct safety-related checks that do not bear directly on the reasons for the stop including asking for license and registration, checking criminal records, and outstanding warrants. Rodriguez v. United States, 575 U.S. 348, 355 (2015). However, when inquiring on these other related checks, the stop cannot be prolonged beyond the time reasonably required to complete the original reason for the stop absent reasonable suspicion to justify detaining the individual. Id. The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose. See Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion). "[O]nce the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver 'must be allowed to proceed on his way.' " United States v. Branch, 537 F.3d 328, 336 (4th Cir.2008) (quoting Rusher, 966 F.2d at 876). "Any further investigative detention ... is beyond the scope of the Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime or the individual consents to the further detention." United States v. Farrior, 535 F.3d 210, 217 (4th Cir. 2008).

When following up on the initial reasons for a traffic stop, the officer must employ "the least intrusive means reasonably available to verify or dispel [his] suspicion in a short period of time." See United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011), as amended (Aug. 2, 2011). To be clear, the law does not require that the officer employ the least intrusive means conceivable. See United States v. Sharpe, 470 U.S. 675, 686–87 (1985) ("A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some

5

alternative means by which the objectives of the police might have been accomplished."). If an officer acts unreasonably in attempting to confirm his suspicions during a traffic stop, however, he runs afoul of Terry's second prong, whether his actions were reasonably related in scope to the bases of the seizure. United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016).

Khalaf's stop began after officers observed him run a stop sign. While the dashcam video does not decisively confirm Khalaf's traffic infraction, the officers' testimony under oath satisfies the requirement that the stop was not pretextual or unreasonable under the circumstances. Whren v. United States, 517 U.S. 806, 810 (1996). Once officers turned on their patrol lights and approached Khalaf's vehicle, the hypothetical clock measuring the reasonableness of the traffic stop began.

The officers' interactions with Khalaf and the other passengers lasted approximately ten minutes before Khalaf was placed in handcuffs and twelve minutes before he was provided Miranda warnings. The officers conducted themselves in a way typical of a generic traffic violation. Deputy Shull approached the vehicle shortly after parking behind it in the driveway. He asked all individuals in the vehicle for their licenses and got identifying information from those who said they did not possess driver's licenses. With this information, Deputy Shull went back to his patrol car and communicated this information to his dispatch.

It took roughly 3.5 minutes for the dispatcher to send the officers some identifying information on the three individuals in the car. The officers learned that at least one person was on the "no fourth list" and that multiple were currently on probation. Upon returning to the car with this information, about six minutes into the traffic stop, the officers asked about the occupant's probationary status. Officers also said to be honest if there was anything illegal

in the car. Less than a minute later and about seven minutes since the stop's beginning, Khalaf said there was a "strap" (gun) in the backseat.

While Khalaf believes that officers' actions unreasonably prolonged the length of the traffic stop, the evidence and caselaw demonstrate that the officers were diligent in their handling of the traffic stop. The officers' inquiry as to whether there was anything illegal in the car was permissible and did not unlawfully prolong the traffic stop. United States v. Buzzard, 1 F.4th 198, 203 (2021) (discussing how traffic stop caselaw developed and that generally asking if illegal items were in the car related to road and highway safety because illegal items could impact a driver's driving ability or pose a danger to officers and other civilians).

Questioning Khalaf about the presence of illegal items was appropriate given the officers' need to dispel concerns about Khalaf's driving abilities since he committed a traffic infraction late at night. Additionally, upon learning of the occupants' probationary status, the question about the presence of illegal items was logical to dispel any concerns officers may have possessed for their own safety. Importantly, this did not unnecessarily prolong the stop because soon after the officers' questions, less than eight minutes from the start of the stop, Khalaf informed the officers about the firearm in the car. Moreover, the officers had not yet finished the routine tasks associated with this traffic stop such as warning Khalaf or issuing a summons.

Khalaf's caselaw cited to support his argument and suppression differ in material ways from the events of his own traffic stop. In Digiovanni, after pulling the driver over for following another car too closely, the officer questioned the driver for ten minutes about the transport of illegal drugs before asking for his driver's license. 650 F.3d 498 (4th Cir. 2011), as

7

amended (Aug. 2, 2011). The court found suppression appropriate because the officer unreasonably prolonged the length of the traffic stop. In Khalaf's case, however, the officers moved swiftly, immediately got the identification information of all individuals, and worked the traffic stop diligently. Importantly, the officers' questions about the presence of illegal items in the vehicle occupied by persons on state probation was reasonable and did not unnecessarily prolong the stop. See Buzzard 1 F.4th at 203-4 (Officer's questions if there was anything illegal in the car were not outside the scope of the stop and did not turn it into an investigation into criminal conduct because the questions related to officer safety, a point of emphasis for the traffic stop. Additionally, the court found that the stopped individual's criminal history and history with the officer supported the officer's question about illegal items in the car.).

In Santiago, the officer pulled a vehicle over for speeding and questioned the individuals in the car immediately about matters unrelated to speeding. United States v. Santiago, 869 F. Supp. 2d 707 (E.D. Va. 2012). The officer's unnecessary questioning of the individuals prolonged the traffic stop which allowed time for a police canine to arrive on the scene and alert to the presence of drugs. The evidence was later suppressed because the court held that the officer unreasonably prolonged the length of the stop. Here, in contrast, the officers did not unreasonably prolong the stop by briefly questioning Khalaf and the vehicle's occupants about illegal items.

In Williams, evidence was suppressed after a vehicle was pulled over and police lawfully issued a ticket to the driver but prolonged the stop by ordering the driver to remain there until a drug dog arrived and sniffed the car two minutes later. United States v. Williams, 808 F.3d

238 (4th Cir. 2015). The illegal items later found by the dog were suppressed after the court found that the order requiring the driver to wait without reasonable suspicion that crime was afoot illegally extended the traffic stop. The traffic stop in Williams is distinguishable from Khalaf's case because the officers did not unreasonably prolong the stop.

Lastly, in Bowman, an individual was pulled over for suspicion of driving under the influence and given a ticket. United States v. Bowman, 884 F.3d 200 (4th Cir. 2018). After receiving the ticket, the driver and passenger were questioned by officers, appeared nervous, and gave officers questionable answers, which caused the officers to prolong the stop until a K-9 unit arrived and alerted on the vehicle. The Fourth Circuit suppressed the evidence, concluding that the facts did not support reasonable suspicion to prolong the stop. Again, this case is different because Khalaf's traffic stop was not unreasonably prolonged.

The government asserts that the facts are more akin to the situation in Buzzard where police officers conducted a traffic stop and asked the individuals stopped whether there were illegal items in the car. United States v. Buzzard, 1 F.4th 198, 204 (2021). The stopped individuals volunteered drug paraphernalia to officers and then officers searched the car and found firearms. The Fourth Circuit found that the stop was legal because the officer did not prolong the stop when he asked the individuals if there were illegal items in the car and that this was a valid line of questioning because it could be considered relevant to officer safety during a stop.

Here the stop and all actions occurring before the officers developed probable cause to search the vehicle took place within eight minutes. The officers' questions about the presence of illegal items in the car were appropriate and took place during the normal course

9

of handling the traffic infraction. Under the cases cited by Khalaf, his traffic stop was not unreasonably prolonged in violation of the Fourth Amendment.

### b. Probable Cause to Search the Vehicle

Khalaf's statement about the presence of a gun in the vehicle created probable cause for the officers to legally search his vehicle and detain him. Khalaf's challenge of the officers' probable cause to search his vehicle is unsuccessful because his argument focuses on the search's legality given his probationary status. However, analysis of Khalaf's probationary status is unnecessary because probable cause and the automobile exception to the Fourth Amendment, created by Khalaf's statements to officers about the presence of a gun in the vehicle, provided legal support for the search.

The Fourth Amendment generally requires police to secure a warrant before conducting a search. California v. Carney, 471 U.S. 386, 390-391 (1985). "Under the 'automobile exception,' '[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more.'" United States v. Brookins, 345 F.3d 231, 235 (4th Cir. 2003) (quoting Maryland v. Dyson, 527 U.S. 465, 466 (1999). Probable cause requires a person of reasonable prudence to believe the "fair probability that contraband or evidence of a crime will be found in a particular place" based on the known facts and circumstances. Illinois v. Gates, 462 U.S. 213, 238, (1983); Ornelas v. United States, 517 U.S. 690, 696 (1996). "[O]nce police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'" United States v. Kelly, 592 F.3d 586, 590 (4th Cir. 2010) (quoting United States v. Ross, 456 U.S. 798, 825, (1982)); California v. Acevedo, 500 U.S. 565 (1991) (search of

10

containers in an automobile is permitted if police have probable cause to believe the container holds contraband or evidence).

Probable cause to search Khalaf and his vehicle is satisfied because Khalaf verbally informed officers that there was a gun in the car and that he was on probation. Officers also knew that a passenger, Jesse Pulliam, was on the "no fourth list." Given this information, officers had probable cause to believe the vehicle contained contraband or evidence of a crime, felon in possession of a firearm. Additionally, when Khalaf was legally searched after exiting the vehicle, other evidence of contraband (cash, multiple cell phones, a bag with crystalline substance) was found on his person which would demonstrate probable cause to search the vehicle.

Khalaf's arguments, that the search should be evaluated under the balancing test enunciated in United States v. Knights, 534 U.S. 112, 114 (2001), requiring "assessment of the degree to which a search intrudes upon an individual's privacy with the degree to which it is needed for the promotion of legitimate governmental interests" and that no warrantless search provision existed, erroneously focus on the officers' reasonable suspicion for the original stop and ignore the well-established automobile exception to the warrant requirement. Khalaf fails to recognize that once he informed officers about the gun in the back seat, the reasonable suspicion for the initial stop was transcended by the probable cause that a felon in possession crime was being committed. With probable cause, the officers were justified to detain Khalaf and search his vehicle. For these reasons, the evidence recovered from Khalaf's vehicle was not illegally seized and will not be suppressed.

### c. Suppression of Khalaf's Statements

Statements Khalaf made during the traffic stop and when he was detained upon exiting his vehicle will not be suppressed. While Khalaf argues he was subjected to custodial interrogation and therefore he should have been advised of his Miranda rights, the totality of the circumstances demonstrates otherwise.

Law enforcement officers are not required to administer Miranda warnings to everyone they question. Oregon v. Mathiason, 429 U.S. 492, 495, (1977) (per curiam). However, "[a] person subjected to custodial interrogation is entitled to the procedural safeguards prescribed by Miranda, and therefore, any statements a suspect makes during custodial interrogation are inadmissible in the prosecution's case in chief unless prior Miranda warnings have been given." United States v. Leshuk, 65 F.3d 1105, 1108 (4th Cir. 1995) (citing Stansbury v. California, 511 U.S. 318, 321 (1994); Berkemer v. McCarty, 468 U.S. 420, 433, (1984)). Therefore, Miranda is only implicated when officers question an individual who is in custody. United States v. Jamison, 509 F.3d 623, 628 (4th Cir.2007). An individual "is 'in custody' for purposes of receiving Miranda protection ... [when] there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125, (1983) (per curiam) (quoting Mathiason, 429 U.S. at 495). This restraint on freedom is decided based on an objective evaluation of the totality of the circumstances from a reasonable person in Khalaf's situation. United States v. Elston, 479 F.3d 314, 319 (4th Cir. 2007).

An individual detained in a traffic stop generally is not in custody for Miranda purposes. See Berkemer v. McCarty, 468 U.S. 420, 439-440 (1984) (the typical traffic stop is more analogous to a Terry stop than formal arrest). Only if the motorist is detained "to a 'degree

12

associated with formal arrest' " will he be entitled to the <u>Miranda</u> protections for in-custody interrogations. <u>Id</u>. at 436 (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125, (1983) (per curiam)). Furthermore, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." <u>Berkemer</u>, 468 U.S. at 442 (citing <u>Beckwith v. United States</u>, 425 U.S. 341, 346-347 (1976)).

The totality of the circumstances do not demonstrate that Khalaf was in custody prior to the time he was read his <u>Miranda</u> warning by officers. Therefore, statements by Khalaf given to officers are admissible and will not be suppressed. Khalaf's traffic stop and eventual arrest took place in a publicly visible space. When the officers removed Khalaf from the car, Khalaf was informed that he was being detained and that he was not under arrest. Because Khalaf told officers there was a gun in the back seat, he was placed in handcuffs so officers could conduct a safety sweep of the car. Furthermore, on video around the 10:30 mark, officers repeated to Khalaf that he was just being detained at that moment and not in custody. While he was detained in the driveway, Khalaf was not placed in the police vehicle or any other confined space. Additionally, the two officers did not raise their voices or physically encroach upon Khalaf's personal space in a way that may have made Khalaf feel physically threatened. While detained, Khalaf was not forced to speak to officers but he personally chose to continue making statements to them. Statements made voluntarily while detained are admissible without <u>Miranda</u> warnings. <u>Leshuk</u>, 65 F.3d at 1110 (4th Cir. 1995) (statements that were made by suspects while detained were admissible because the officers did not elicit the statements through coercion or intimidation).

While Khalaf may argue that because he was placed in handcuffs and police followed his vehicle into a driveway, effectively preventing any opportunity to leave, these actions do not constitute custody. See United States v. Elston, 479 F.3d 314, 320 (4th Cir. 2007) (quoting Leshuk, 65 F.3d at 1109–10 ("drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest.")). Furthermore, although Deputy Fix testified at the suppression hearing that it was his intent to search the vehicle upon learning that Jesse Pulliam had a "no fourth list" waiver, the test is an objective one not determined by the officer's subjective intent. Berkemer, 468 U.S. at 441-42. Khalaf's statements made during the traffic stop and when he was detained are admissible because they were voluntarily given and the totality of the circumstances surrounding the stop demonstrate that Khalaf was not in custody before he was read his Miranda rights.

### III. Conclusion

For the foregoing reasons, Khalaf's motion to suppress, ECF No. 77, is **DENIED**. This opinion accompanies the order entered by the court on October 4, 2022, ECF No. 94.

Entered: October 24, 2022

Digitally signed by Michael F. Urbanski      Chief U.S. District Judge
Date: 2022.10.24 11:21:12 -04'00'

Michael F. Urbanski
Chief United States District Judge